# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LORI LYNNE ROMIG,

                Plaintiff.

     v.

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,

                Defendant.

No. 3:18-CV-1819

(Judge Brann)

## MEMORANDUM OPINION

### MAY 16, 2019

## I.    Procedural Background

The Court considers here the appeal of Plaintiff Lori Lynne Romig from an adverse decision of the Social Security Administration ("SSA" or "Agency") on her applications for disability insurance benefits and supplemental security income. Plaintiff's claim was initially denied at the administrative level on October 23, 2014. Plaintiff then requested a hearing before an administrative law judge ("ALJ") and received such a hearing on January 10, 2017 in Wilkes-Barre, Pennsylvania. On June 13, 2017, ALJ Therese A. Hardiman issued a written decision that denied both of Plaintiff's applications. Plaintiff then unsuccessfully requested review from the Appeals Council. The Appeals Council's denial of Plaintiff's request for review

dated July 19, 2018 is a final decision of the Agency that vests this Court with jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

## II.     Testimony before the ALJ

At the hearing of January 10, 2017, the Plaintiff testified. She was unrepresented at the hearing. Also testifying was Patricia Chilleri, a vocational expert. The testimony may be summarized as follows:

### a.     Plaintiff's Testimony

Plaintiff's Testimony indicated that she was born on January 11, 1963. She was one day short of her fifty-fourth birthday on the date of the hearing. At the time of the hearing she was five feet six inches tall and weighed approximately one hundred and sixty-five pounds. She is ambidextrous. She is divorced and living with her daughter and granddaughter. She is also her granddaughter's legal guardian. (R. 82-86).

Plaintiff graduated from high school and has received some vocational training. She currently receives food stamps and Medicaid. She holds a driver's license and can read, write, add, and subtract. (R. 86-87).

Plaintiff's alleged onset of disability date is January 2, 2014 but she has worked at times since then and was working twenty hours per week at the time of her hearing for Hanna Transport. She is paid based upon the number of trips she makes. Her job involves transporting special needs children. The route she is currently assigned requires her to lift a ramp eight to ten times per day. This is

causing her much pain and forcing her to take a medication she should not be using while driving. She has asked for a different route even though it would involve a substantial pay cut. (R. 87-90).

Plaintiff last saw a doctor in December 2016. The last physician she saw was a Doctor Herbert but she usually sees a nurse practitioner. She has an appointment to see a Dr. Porowski who is to perform a procedure to "burn the nerves" in her back. Dr. Porowski has told her that he can help with her neck pain but that he did not think that he could alleviate her back pain. She is able to take care of her hygienic and grooming needs although washing her hair is difficult because she has trouble reaching above her head. She does the best she can with cooking, cleaning, and laundry but cannot take out her own garbage or mow the lawn. She is able to use her computer to pay bills, do research, and communicate with friends on Facebook. She formerly enjoyed dancing and kayaking but is no longer able to do those things. She does not belong to any club or civic group. While she does go shopping, she requires assistance to carry the bags home from the store. (R. 90-93).

Plaintiff stated that she was not currently receiving any psychological counseling due to her counselor's resignation. She was planning to seek out a new counselor. The ramp to the vehicle she drives is the heaviest thing she has lifted in the last thirty days. She does not know how much it weighs but stated that it causes her a problem. She can straighten her legs and put them down from a seated position and she can straighten her arms forward and bring them back. Reaching overhead

is problematic, especially with her left arm. She drinks alcohol rarely because of the expense but states that it can help alleviate her pain. (R. 94-95).

She usually rises at 5:00 a.m. and goes to sleep on work days at 7:30 to 8:00 p.m. She sleeps about six hours but this sleep is interrupted because she awakens several times. She often takes an ibuprofen during one of these sleep interruptions. She estimates that she can stand for twenty minutes to half an hour and can sit for "a couple of hours" but that she must change positions every fifteen minutes due to her pain. She can walk "a couple of blocks". (R. 96-97).

Plaintiff takes trazodone to help her sleep, Flexeril as a muscle relaxant, clonidine HCL for angina, Celexa for depression, and ibuprofen and oxycodone HCL for pain control. She uses a heating pad while seated to help ease her pain and smokes marijuana for the same reason. Her current medications cause no side effects. Despite the fact that she continued working on a part-time basis after her alleged onset date, she has "lost everything" and is in "the middle of a bankruptcy".

She has had two neck surgeries. The first surgery was in January 2014 and the second surgery was in August 2016. The second surgery was performed by a Doctor Sefter, an orthopedic surgeon at the State College Medical Center. Cold weather and any type of strenuous activity aggravates her neck symptoms. (R. 98-101).

**b.      Testimony of Patricia Chilleri**

Patricia Chilleri, a vocational expert, testified that she had reviewed Plaintiff's work history.  Ms. Chilleri stated that Plaintiff is "closely approaching old age" in social security parlance.  Her work history consists mainly of employment with a succession of mortgage companies in the capacity of a loan officer.  These jobs were classified as "sedentary, skilled".  Ms. Chilleri stated that her characterization of Plaintiff's past relevant work was consistent with the Dictionary of Occupational Titles. (R. 103-104).

The ALJ asked Ms. Chilleri to respond to a hypothetical question in which she was asked to assume "an individual with the same age, education, and past work experience as the claimant.  Assume further that this individual retains the capacity to perform light work, however, that work is limited.  There should be no more that occasional bilateral upper extremity pushing or pulling; occasional climbing, balancing, and stooping, kneeling, crouching, and crawling, but never on ladders; there should be no bilateral reaching overhead; there would be a need to avoid temperature extremes, vibrations, and hazards.  Such an individual would be limited to simple, routine tasks that were low stress as defined as only occasional decision making required and only occasional changes in the work setting. Such an individual should have no interaction with the public, but could have occasional interaction with coworkers or supervisors."   In response to this hypothetical question, Ms. Chilleri stated that the hypothetical individual would not be able to perform any of

Plaintiff's past relevant work. However, she testified that the hypothetical individual would be capable of performing several jobs that exist in significant numbers in the national economy including: "administrative support worker"; "weigher, checker, and measurer"; and "stock clerk, retail ticketer". (R. at 105-106).

When the ALJ modified the hypothetical question to include sedentary exertional level as opposed to light exertional level, Ms. Chilleri again responded that such an individual could not perform Plaintiff's past relevant work. Ms. Chilleri did not identify any sedentary level jobs that Plaintiff could perform. When the ALJ added still another limitation involving a need for unscheduled breaks and a tolerance for being off task twenty percent of a workday, Ms. Chilleri stated that an individual with those limitations would be unemployable. (R. 106-107).

## III.  Medical Evidence

### a.  Henry T. Dietrich III, M.D.

Between October 24, 2014 and September 21, 2015 Plaintiff saw Dr. Dietrich on ten occasions. On October 24, 2014, Dr. Dietrich stated that Plaintiff presented with complaints of thoracic and neck pain. On physical examination she was described as "alert, healthy, no distress, well nourished and well developed". Dr. Dietrich's plan was to refer plaintiff for pain management and an orthopedic examination. He prescribed oxycodone-acetaminophen due to his perception that Plaintiff was "getting poor pain control with the shorter acting oxycodone". (R. 528-29).

On December 12, 2014, Plaintiff again presented with complaints of neck pain running down into her arms and hands. Dr. Dietrich diagnosed depressive disorder, carpal tunnel syndrome, drug abuse in remission, and cervical disc degeneration. Plaintiff was again described as "alert, healthy, no distress", and her neurological examination indicated that she was "alert and oriented x 3 with fluent speech, no focal motor/sensory deficits, gait normal, reflexes normal and symmetric". Dr. Dietrich renewed her prescription for oxycodone-acetaminophen and indicated that he planned to refer her for a neuropsychological examination. He also indicated that he did not believe she was capable of working "based on the level of pain she is reporting". (R. 524-25).

On February 12, 2015, Plaintiff saw Dr. Dietrich again. Her diagnoses and physical examinations remained the same as at previous visits but Dr. Dietrich observed: "Basically she again is asking for increase in pain medication. It is obvious to me she is addicted. She cannot see this. She had all sorts of rationalizations as to why she needed more. She previously was in rehab for cocaine addiction and at times has also drank very heavily. She was very upset. However, I refused to give in and gave her three choices. 1. Enter into our opioid detox outpatient program using suboxone. 2. Go see a different suboxone provider for maintenance. 3. Go to rehab. She also has choice of trying to find another doctor to prescribe opioids, but I did not recommend this. Though she certainly has pain, in my opinion it has gotten worse rather than better since starting opioids. In addition, she still thinks there is

something wrong with her neck that another surgery will help, but I am very skeptical that there is a solution in that direction. I believe that as an addict her pain is exaggerated in her brain to justify taking more pain medication, and she is sliding further into opioid addiction. There is a way out, which I offered, but she was not willing to consider these options." (R. at 522-23).

On seven subsequent occasions from February 19, 2015 through September 21, 2015, Dr. Dietrich's progress notes of his sessions with Plaintiff remained essentially the same in terms of diagnoses and physical examination findings. On July 15, 2015, Dr. Dietrich referred Plaintiff to a Dr. Sefter for an orthopedic evaluation. On September 9, 2015, Dr. Dietrich noted that Plaintiff was "one month postop from neck surgery" and that Plaintiff's neck pain was "immediately better" and her right arm pain "is slightly better". At Dr. Dietrich's last session with Plaintiff on September 21, 2015, his progress note indicates Plaintiff related that her pain "is slowly getting better" and that her surgeon had told her that it "would be late November or December before [she would be] ready to work." Dr. Dietrich referred Plaintiff for pain management and noted: "she continues to obsess about pain medicine. She has a prior history of abusive drinking, and cocaine addiction. I wrote for some hydrocodone to get her to next visit with ortho. I do not believe it is in her best interest to continue on opioids. She had a successful neck surgery. It is going to be a battle. I suggested she start going back to meetings." (R. 503-522).

### b. Andrew Cole, Psychologist

Dr. Cole saw Plaintiff on one occasion for the purpose of a consulting psychiatric examination on September 12, 2014. He took a history from the claimant which included her recitation of "chronic daily anxiety, including excessive apprehension, worry, restlessness, fatigue, difficulty concentrating, and irritability." Dr. Cole's mental status examination revealed that she was "cooperative in demeanor and responsive to questions. Her manner of relating, social skills, and overall presentation were adequate." Her speech was "fluent and clear", her thought processes were "coherent and goal directed"; her affect was "dysphoric, depressed, and tearful"; her attention, concentration, and recent and remote memory skills were intact; her cognitive functioning was below average; and her insight and judgment were fair to good.

Dr. Cole diagnosed major depressive disorder, generalized anxiety disorder, and substance abuse disorder. He recommended individual psychological therapy, drug and alcohol treatment, and psychiatric intervention.

Dr. Cole also completed a Medical Source Statement regarding Plaintiff's mental ability to perform work-related activities. He found that Plaintiff had no deficit in her ability to understand, remember, and carry out simple instructions; that Plaintiff was mildly restricted in her ability to make judgments on simple, work-related decisions; that Plaintiff was moderately restricted in her ability to understand or carry out complex instructions; and that Plaintiff had a marked impairment in

making judgments on complex, work-related decisions.  These impairments resulted from "distractibility, memory problems, secondary to anxiety/mood".  Dr. Cole also assessed that Plaintiff had moderate impairment of her ability to interact appropriately with the public, co-workers, and supervisors and in responding to changes in a routine work setting. (R. 441-448).

### c.    John C. Sefter, D.O.

Dr. Sefter, an orthopedic surgeon, saw Plaintiff on seven occasions between July 17, 2015 and August 17, 2016. Dr. Sefter initially saw her due to the fact that she had "a less than optimal result" after a neck surgery performed by another surgeon in 2014.  He assessed Plaintiff with musculoskeletal stiffness and weakness, headaches, fatigue, depression, or sleep issues, and numbness and tingling in her arms.

On July 30, 2015, Dr. Sefter concluded that incomplete healing at C5-C6, the site of Plaintiff's previous surgery, had made a second surgical procedure to "take down the metal interbody device and use an iliac crest bone graft with a plate to secure the construct" necessary.  He also indicated at this time that he believed that Plaintiff had become addicted to Percoset due to the fact that "she has been on it so long."  He noted: "We just have to be really on top of things when we manage her postoperatively."

On August 10, 2015, Dr. Sefter performed surgery to remove hardware from the previous operation, remove unharvested disc material from the previous

operation, and affix and secure a new plate to achieve an "anterior interbody fusion at C5-C6 cervical spine".  At first follow-up examination on August 21, 2015, Dr. Sefter observed that Plaintiff's wound was clean and dry, her x-rays looked superb, and she was "doing well in the short run."

On September 11, 2015, Dr. Sefter noted that Plaintiff was improving with better motion, decreased pain, and good functionality. She was neurologically intact but exhibited tenderness and tendinopathy of the shoulder.  Her x-rays revealed "good consolidation in the short run of the cervical spine."

On October 2, 2015, Plaintiff was "doing moderately well … all things considered."  She had 5/5 strength with good sensation and motor ability. Dr. Sefter noted: "X-rays are superb. Perfect positioning of her implant."  Dr. Sefter released Plaintiff to "return to light duty work."

On October 23, 2015, Dr. Sefter found Plaintiff to be neurologically intact without deficit and "doing well in the short run".  He recommended exercise and strength training, anti inflammatory medication, reduced her prescription for narcotics, and discharged Plaintiff to return on an as needed basis.

Approximately ten months later, on August 17, 2016, Plaintiff presented once again with complaints of thoracic spine pain.  Dr. Sefter's examination indicated good range of motion of the cervical spine without restriction and 5/5 strength throughout. Plaintiff's x-rays of the cervical and thoracic spine were "essentially normal except for some degenerative changes."  Dr. Sefter recommended trigger

point injections but prescribed no narcotics and found that surgery was "not indicated". He again noted that Plaintiff could return to work. (R. 563-573).

### d. Anne C. Zaydon, M.D. and Erin Urbanowicz, Psy.D.

On October 21, 2014, Dr. Zaydon and Dr. Urbanowicz reviewed Plaintiff's medical records from June 2014 through October 20, 2014. Neither Dr. Zaydon nor Dr. Urbanowicz had personal contact with the Plaintiff. Based upon her review of these medical records, Dr. Zaydon indicated that Plaintiff had severe impairments including: discogenic and degenerative spinal disorders; affective disorders; anxiety disorders; and substance abuse disorders.

Dr. Zaydon completed a Residual Functional Capacity Assessment regarding Plaintiff. Dr. Zaydon assessed that Plaintiff was capable of: occasionally lifting/carrying up to twenty pounds; frequently lifting/carrying up to ten pounds; standing and/or walking six hours in an eight hour workday; sitting six hours in an eight hour workday; unlimited pushing/pulling of hand and foot controls; unlimited climbing of ramps and stairs, balancing, stooping, kneeling, and crawling; frequently crouching; and occasionally climbing ladders, ropes, or scaffolds. Plaintiff was environmentally restricted in that she needed to avoid even moderate exposure to extreme cold and wetness and hazards such as moving machinery or heights.

Dr. Urbanowicz evaluated Plaintiff's mental status and assessed that Plaintiff was not significantly limited in the ability to remember locations and work procedures; the ability to understand and remember short and simple instructions;

the ability to carry out short and simple instructions; the ability to sustain an ordinary routine without special supervision; the ability to work in proximity to others without being distracted; the ability to make simple work-related decisions; the ability to accept instructions from supervisors; the ability to get along with coworkers; and the ability to take appropriate precautions regarding normal hazards. Dr. Urbanowicz also opined that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to maintain regular attendance and be punctual within customary tolerances; the ability to interact appropriately with the general public; and the ability to respond appropriately to changes in the work setting.

Both Dr. Zaydon and Dr. Urbanowicz found that Plaintiff was able to meet the demands of competitive employment despite the limitations each had identified. (R. 109-124).

IV. **The ALJ's Decision**

The ALJ's Notice of Decision (R. 49-66) was unfavorable to the claimant and included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2. The claimant has not engaged in substantial gainful activities since January 2, 2014, the alleged onset date.

3.    The claimant has the following severe impairments: degenerative disc disease/degenerative joint disease of the cervical spine - status post anterior cervical discectomy and fusion and revision of the anterior cervical discectomy and fusion; a depressive disorder/major depressive disorder; a generalized anxiety disorder; and a substance abuse disorder.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in the Social Security Act.

5.    After careful consideration of the entire record the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567 (b) and 416.967 (b) except the claimant: could occasionally use her bilateral upward extremities for pushing and pulling; could occasionally climb, balance, stoop, kneel, crouch, or crawl; must avoid bilateral overhead reaching; must avoid temperature extremes, vibrations, and hazards; is limited to unskilled work activity that is low stress, which is defined as work with only occasional decision making and only occasional changes in the work setting; could have no

interaction with the public and only occasional interaction with co-workers and supervisors.

6. The claimant has no past relevant work.

7. The claimant was born on January 11, 1963 and was fifty years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not an issue because the claimant does not have past relevant work.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 2, 2014 through the date of this decision.

## V. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled. [1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he is unable to engage in his past relevant work.  If the claimant satisfies this burden, then the Commissioner must

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (Doc. 12-2 at 62).

## VI. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla". It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The United States Court of Appeals for the Third Circuit further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence vel non of substantial evidence is not merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See Cotter*, 642 F.2d at

706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear that it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, our Court of Appeals clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See, e.g., Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence

supporting the Commissioner's decision, . . . the Cotter doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See, e.g., Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## VII. Discussion

### a. General Considerations

At the outset of this Court's review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, I note that the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial; rather, the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

### b. Plaintiff's Allegation of Error

Plaintiff asserts that the ALJ committed an error of law when she elevated the opinions of Dr. Zaydon and Dr. Urbanowicz over that of Dr. Dietrich, a treating physician. Plaintiff's asserts further that the ALJ abused her discretion by relying on

these non-examining, non-treating physicians because they did not view the entire medical record before expressing their opinions.

Plaintiff contends correctly that the opinion of a treating physician is generally entitled to great deference under the Agency's own rules and the case law of the Third Circuit. This is more particularly true when there is a long, longitudinal record created by the treating physician that documents his treatment of the patient. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). Indeed, when a treating physician's opinion regarding the severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, we (SSA) will give it controlling weight." 20 C.F.R § 404.1527 (c)(2). Yet, it is also true that, where competing medical evidence exists, it is within the ALJ's authority to choose which medical evidence to credit and which to reject as long as there is a rational basis for the decision. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). The ALJ may even elevate the opinion of a non-treating, non-examining physician over that of a treating physician in an appropriate case. *Morales*, supra, at 317; See also 20 C.F.R. § 404.1527 (f) (1).

While there can be no dispute that Dr. Dietrich qualifies as a treating physician in this case, his opinion that Plaintiff was disabled as of December 12, 2014 (R. at 498) was based mainly on the level of pain Plaintiff was reporting. The opinion is unaccompanied by objective diagnostic evidence or examination findings and, as the

ALJ noted, it does not identify any specific, work-related functional limitations. (R. at 60). Having reviewed Dr. Dietrich's progress notes, the Court finds that the ALJ's characterization of them as essentially benign and normal is accurate. Finally, the premise that the Plaintiff was disabled for a period in excess of one year (a necessary precursor to an award of disability benefits) is seriously undercut by the opinion of Dr. Sefter, Plaintiff's surgeon, that she was capable of returning to light duty work on October 2, 2015. (R. at 565).

Plaintiff's contention that a remand is necessary to permit a review of medical records (Exibits19F-23F) which were unavailable to the doctors whose opinions the ALJ credited is also rejected. Having reviewed these records, the Court can only conclude that they would not have changed the result. In fact, the most relevant of these records are the progress notes of Dr. James Herberg and Dr. Michael Greenberg (Exhibit 21F at 576-590) regarding their treatment of Plaintiff on six occasions between August 8, 2016 and December 19, 2016. These progress notes, like those of Dr. Dietrich, are essentially benign, document only conservative treatment, and point to no specific functional limitations of any kind. In fact, Dr. Greenberg observed (R. 586) on September 22, 2016 that Plaintiff was currently "working two jobs". The Court will therefore regard the ALJ's failure to discuss Exhibits 19F-23F as harmless error. (*See Albury*, supra).

## VIII.  Conclusion

For the reasons discussed above, the Court concludes that the Acting Commissioner's decision to deny benefits in this case is supported by substantial evidence as required by Richardson and Cotter, supra.  An Order consistent with this conclusion will be filed contemporaneously.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge